UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO ROMERO,<br><br>Plaintiff,<br><br>v.<br><br>TRIBUNE MEDIA COMPANY,<br><br>Defendant. | No.  2:24-cv-3143 AC<br><br><br>ORDER |

Defendant's motion for summary judgement, ECF No. 41, was heard on March 18, 2026. ECF No. 62.  Both parties were represented by counsel at the hearing.  The operative First Amended Complaint asserts claims for wrongful termination, disability and medical condition discrimination, failure to accommodate disability, failure to engage in the mandatory interactive process, and retaliation.  ECF No. 15.  The retaliation cause of action and plaintiff's prayer for punitive damages were previously dismissed on defendant's motion.  ECF No. 24 (so ordering, and otherwise denying defendant's motion to dismiss).  Defendant now moves for summary judgment on all remaining claims.  ECF No. 41.  Plaintiff opposes the motion.  ECF No. 46. Defendant submitted a reply.  ECF No. 55.  Defendant also objects to all of plaintiff's submitted exhibits (ECF No. 49) on the grounds that the plaintiff failed to authenticate and lay the foundation for the exhibits.  ECF No. 58.

Two motions to exclude expert witnesses are also before the court.  Defendant moves to

1

exclude the testimony of plaintiff's expert witness George A. Jouganatos, Ph.D. pursuant to Fed. R. Civ. P. 26, Fed. R. Evid. 702, and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).  ECF No. 40.  Plaintiff moves to strike or exclude the testimony of defendant's expert June Hagen, Ph.D. pursuant to Rule 702 and Daubert.  ECF No. 42-1 at 7.  These matters are also addressed below.

## I.        Objection to Exhibits

Defendant has moved to strike all of the exhibits submitted in support of plaintiff's opposition to summary judgment (ECF No. 49), asserting that they are not authenticated and lack foundation.  ECF No. 58.  Defendant asserts the "exhibits included in the Index of Exhibits are not attached to, and do not reference, a corresponding declaration that lays a foundation or authenticates the contents of the documents."  ECF No. 58 at 2.  Following oral argument on the pending motions, plaintiff's counsel submitted an ex-parte application to submit a signed declaration authenticating the exhibits.  ECF No. 63.  Defendant submitted no response to the application.  Having fully considered the matter, the undersigned concludes that it is in the interest of justice to consider the exhibits, and such consideration will not prejudice the defendant because despite the fact that the exhibits were not originally authenticated, defendant did have the opportunity to review and respond to them.  ECF No. 57.  The authentication deficiency has now been cured.  ECF No. 63.  Accordingly, defendant's objection is OVERRULED, and plaintiff's late-authenticated exhibits have been fully considered.  This determination is made in the interest of justice and judicial economy.  Plaintiff's ex parte application (ECF No. 63) is GRANTED.

## II.        Standard for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248. In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Service, Inc., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

### III.    Statement of Undisputed Facts

Unless otherwise specified, the following facts are either expressly undisputed by the parties or have been determined by the court, upon a full review of the record, to be undisputed by competent evidence. Defendant's statement of facts with plaintiff's response is located at ECF No. 51. Defendants' reply is located at ECF No. 57.

Tribune Media Company ("Tribune"), a national media company owning and operating various news outlets and television stations throughout the country, hired plaintiff on October 31, 2018, in the role of Account Executive. Deposition of Sergio Romero 20:11-20; 52:7-53:13 Romero Dep. Exh. 3, Tribune_000036-37 (Offer Letter). Plaintiff was assigned to work at KTXL FOX40, a television station in Sacramento, California owned by Tribune. Romero Dep. 20:23-21:7; Deposition of Cathy Gunther, 13:24-14:5. In September 2019, Nexstar Media Group, Inc. acquired Tribune. Deposition of Matthew Rosenfeld, 9:20-23. As an Account Executive ("AE") at KTXL ("the Station"), plaintiff was expected to drive revenue through the development of new business accounts and maintain strong client relationships. Romero Dep., 55:16-57:21, Romero Dep. Exh. 4, Tribune_00069 (AE Job Description); Declaration of Cathy Gunther ¶ 3.

The AE position required, among other things, identifying and contacting prospective

4

advertisers, maintaining visibility at local functions, re-engaging former clients and prospects, and creating and selling unique marketing solutions.  Romero Dep., 55:16-57:21, Romero Dep. Exh. 4, Tribune_00069, Gunther Decl. ¶ 13.  AEs are critical to the Station's success.  Gunther Decl. ¶ 13.  Plaintiff held a large account list for the Station.  Rosenfeld Dep. 13:15-20.  Being an AE is a demanding job necessitating in-person attendance.  Romero Dep. 36:21-37:8; 37:21-38:18; 93:16-24; Gunther Dep. 26:23-27:3.

Before plaintiff was hired, he informed Tribune that he might have to take time off due to a kidney growth that tested positive for cancer.  Romero Dep. 72:14-19.  Tribune did not object.  Romero Dep. 72: 14-73: 18.  Plaintiff reached out to Margarita Red-Horse in Human Resources in 2019 about using sick leave and vacation time for the procedure to remove the growth, and she instructed him to request a leave of absence.  Romero Dep., 73:19-74:10; Romero Dep. Exh. 5, Tribune_000069 (Email Correspondence).  Plaintiff elected not to take the leave of absence in 2019.  Romero Dep. 74:22-75:10.

In 2020 plaintiff contacted Jasmine Menechyan, also in HR, regarding taking a leave of absence, again for a continuous growth on both sides of his kidneys.  Romero Dep. 78:10-25; Romero Dep. Exh. 6, Tribune 000061-68.  Human Resources provided plaintiff with the forms necessary to request an accommodation.  Romero Dep. Exh. 6, Tribune_ 000061-68.  Plaintiff elected not to take the leave in 2020.  Romero Dep. 78:19-25.

On June 16, 2023, plaintiff was unfortunately diagnosed with gastric adenocarcinoma, also known as stomach cancer.  Romero Dep. 81:3-13; 152:4-24; Romero Dep. Exh. 23, ROMERO0031-34.  He again requested information about defendant's leave process and defendant's HR representative Margarita Red-Horse, and Program Coordinator, Sandra Mansfield, promptly provided detailed instructions on initiating leave.  Romero Dep., 87:20-89:6; Romero Dep. Exh. 7, Tribune_ 000070-79.  Plaintiff told his direct manager, Dan Haass, of his diagnosis and, in response, Haass suggested plaintiff work remotely starting in August 2023—an accommodation not offered to other employees.  Romero Dep. 37:21-38:18; 91:17-92:7; 93:16-24; Gunther Dep. 26:23-27:7.  Plaintiff acknowledges that working from home beginning in August 2023 was a "fair" accommodation.  Romero Dep., 93 :22-24.

Unbeknownst to Tribune, plaintiff's treating oncologist, Dr. Rashmi Verma, had advised him to stop working as early as August 7, 2023.  Romero Dep., 152:4-24; Romero Dep. Exh. 23, ROMERO0031-34.  Plaintiff kept working, including through two sessions of chemotherapy in September 2023, which he now admits was "overconfident."  Romero Dep. 90:16-91:16.  Plaintiff did not formally initiate CFRA/FMLA leave until October 2023.  Romero Dep., 98:2-99:35, Romero Dep. Exh. 9, Tribune 000327-330.  Even then, it was Tribune who urged plaintiff to initiate his leave as his ability to address his work diminished.  Romero Dep. 94:9-22; 95:23-96:6.  Plaintiff began CFRA/FMLA leave on October 23, 2023, without having submitted the required certification from his physician.  Romero Dep. 119:20-120:28; 136:21-137:7; 210:18-21, Romero Dep. Exh. 18, Tribune 000641-647.  On October 24, 2023, plaintiff informed Tribune that his doctors had approved a return-to-work date of February 1, 2024.  Romero Dep., 113:1-22, Romero Dep. Exh. 16, Tribune_000104-105.  Plaintiff admits in the weeks that followed his initiated leave, maintaining his accounts was "not possible" due to the treatments he was receiving.  Romero Dep. 96:7-25.

UNUM, defendant's third party administrator of statutory leave, repeatedly attempted to obtain plaintiffs medical certification for his leave, contacting him on October 7, 13, and 31.  Romero Dep., 102:10-21, Romero Dep. Exh. 11, Tribune_ 000629-631; Romero Dep., 109:10-19, Romero Dep. Exh. 13, Tribune_000636-638; Romero Dep., 119:20-120:18, Romero Dep. Exh. 18, Tribune 000641-64 7.  When plaintiff failed to provide the documentation, UNUM issued a denial letter to Plaintiff via mail on November 29, 2023.  Romero Dep., 133:9-20; Romero Dep. Exh. 20, Tribune 000648-650.  After receiving this letter, plaintiff contacted Sandra Mansfield on December 8, 2023, who directed him to defendant's Employee Services department, the group most knowledgeable about employee leave procedures.  Romero Dep., 140:7-141:19, Romero Dep. Exh. 21, Tribune 000195-198.  Between December 11 and December 15, 2023, plaintiff exchanged email correspondence with Employee Services representative Jennifer Vansau, who clarified the leave documentation requirements for plaintiff, contacted UNUM on plaintiff's behalf to obtain reasoning of the leave denial, and warned plaintiff that his job was not protected while his leave remained unapproved.  Romero Dep., 144:13-145:9; 145:25-150:3; 151:2-13,

6

Romero Dep. Exh. 22, Tribune 000114-117, 000200-201, 000207-210, 000234-242.

It was not until January 4, 2024, nearly three months after his leave began, that plaintiff submitted the correct medical certification to UNUM.  Romero Dep., 152:4-24; Romero Dep. Exh. 23, ROMERO0031-34.  The submitted certification did not provide a clear return to work date and indicated that plaintiff's doctor had not yet advised him to return to work.  Romero Dep., 152:4-24; Romero Dep. Exh. 23, ROMERO0031-34.  Instead, it contained an estimated continuous period of incapacity from October 13, 2023, through July 4, 2024.  Romero Dep. 152:4-24; 154:4-155:17; Romero Dep. Exh. 23.  Plaintiff understood that his doctor deemed him unable to perform certain functions of his job due to his treatment and recovery.  Romero Dep. 155:9-17.

Based on the documentation submitted, UNUM retroactively approved plaintiff's leave from October 23, 2023 to November 18, 2023; denied it from November 19, 2023 to January 3, 2024; and approved it again from January 4, 2024 to February 28, 2024.  Romero Dep., 172:3-18; Romero Dep. Exh. 26, Tribune_ 000263-265.  Plaintiff was aware of the communication from UNUM stating that February 28, 2024 was the end of his approved leave.  Romero Dep. 161 :3-11.  The correspondence explicitly stated that "[i]fyou need an extension of your leave, you should notify UNUM.  You will be required to provide additional certification of the serious health condition."  Romero Dep., 172:3-18; Romero Dep. Exh. 26, Tribune 000263-265).

Cathy Gunther is General Manager and Vice President of KTXL FOX40.  Gunther Dep. 14:10-13.  Not having heard anything from plaintiff, Cathy Gunther asked Dan Haass to communicate with plaintiff.  Person Most Knowledgeable Deposition ("PMK") Vol. 1, 83:25-84:5.  On February 13, 2024, Haass sent a text message to plaintiff asking him how he was doing.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  Plaintiff responded on February 13, 2024 that his doctors were planning for surgery in March.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  Plaintiff did not inquire about, or even mention, the impending expiration of his leave.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  On March 4, 2024, plaintiff sent a text to Haass that his surgery date was scheduled for March 28, 2024.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25,

ROMERO000l 1-17.  Again, plaintiff did not mention the impending expiration of his leave or inquire about an extension of same.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.

In one of several exchanges in response, Haass stated "I received an extension of your leave from unum but it only went from 2/29 to 3/30.  Obviously that will need to be extended again.  Do you have an idea of recovery time?"  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  Haass clarified immediately after he did not care "from a work perspective."  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  Plaintiff responded on March 4, 2024 that his doctor said that following his March 28, 2024 surgery, there would be 6-8 weeks of recovery, followed by two months of radiation.  Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.

Based on the March 4 text exchange, plaintiff claims he assumed Haass "had inserted himself in the process of the approval process" and that he believed Haass was extending plaintiffs leave on his own.  Romero Dep. 174:25-175:6.  Haass, however, made no such representation to plaintiff, instead he informed plaintiff that he had "received from UNUM via email something that said his leave extension had been approved."  Haass Dep. 31:6-10; Romero Dep., 168:10-169:6, Romero Dep. Exh. 25, ROMERO000l 1-17.  Although the October 31, 2023, November 29, 2023, January 11, 2024, and March 1, 2024 correspondence from UNUM explicitly stated that if plaintiff needed an extension of his leave he was required to notify UNUM and provide additional medical certification to support the request, plaintiff did not contact UNUM, or Tribune's Employee Services department, at any time thereafter, based on his March 4 text exchange with Haass.  Romero Dep., 119:20-120:28, Romero Dep., Exh. 18, Tribune 000641-647; Romero Dep., 172:3-18; Romero Dep. Exh. 26, Tribune_000263-265; Romero Dep., 133:9-20; Romero Dep. Exh. 20, Tribune_ 000648-650; Romero Dep., 160:3-17, Romero Dep. Exh. 24, ROMERO000l 33-136, Romero Dep. 174:25-175:6; 177:5-8.

Defendant has no documents or communications that reference, relate or pertain in any manner to station performance metrics or advertising sales reports that include plaintiff's accounts during 2023 and 2024, nor does it have any reviews or audits of plaintiff's accounts

8

from this time period. ECF No. 57 at 4. The Station's "Review/Preview," a document used for planning that is issued about a month and a half before a new quarter starts, provides a general snapshot of the Station's performance. Covey Dep. 39:4-40:9; Gunther Decl. ¶ 8. Q2 of 2024 on the Review/Preview showed the Station was not performing where it should be. Covey Dep. 41:7-13; 41:20-42:15, Gunther Decl. ¶ 8. In early April 2024, Gunther received a document called The Miller Kaplan Share Report for Ql 2024. Gunther Decl. ¶ 9. The Miller Kaplan Report is a market revenue snapshot that ranks participating television stations based on their revenue share received for that quarter. Gunther Decl. ¶ 9. This document showed that the station lost 1.9 share points- a significant loss comparing Ql of 2023 to Ql of2024; and fell in rank from No. 3 to No. 4, meaning the station was making "backwards progress." Covey Dep. 45:9-46:13; Gunther Decl. ¶ 9. These documents also showed the Station was projected to end Q2 2024 below budget, and was on track to miss its revenue goals, absent a significant change, which provided key information from a planning perspective for the remainder of the year. Covey Dep. 41 :20-25; Gunther Decl. ¶ 10.

At this same time, the Station's Director of Sales exited the Station in March 2024; plaintiff's sales manager went out on medical leave in March 2024; and another sales manager left the Station in April 2024. PMK Vol. 2, 16:14-18. Other AE's were covering plaintiff's accounts, and those covering AE's were almost 100 % commission based. PMK Vol. 2 103:11-25; Gunther Decl. ¶ 4. When an AE is on leave, the Station does not permanently reassign the AE's Station accounts, so an AE's commission continues to accrue for their accounts. Gunther Decl. ¶ 5. Other AEs are assigned to temporarily cover the accounts of an AE who is on leave have little incentive due to the commission structure. Gunther Decl. ¶ 5. This was true with plaintiff's accounts, several of which were large Station accounts. Gunther Dep. 82:4-8. While plaintiff's accounts were temporarily distributed amongst other AEs and Sales Managers, the profitability of those accounts was not maximized where the covering AEs did not have long-standing relationships with the clients, were splitting their attention with their own accounts for which they received commission or were simply not qualified to manage such large accounts. Gunther Decl. ¶¶ 6-7.

Given these personnel shortages, others at the Station were trying to manage plaintiff's accounts themselves, but the Station needed to bring in qualified people to manage the accounts, specifically the large customers plaintiff was responsible for.  PMK Vol. 2, 16:10-24; 23:9-24:13; Gunther Decl. ¶¶ 11-12.  As a network affiliate broadcaster, the NFL Season is the biggest season of the year for KTXL.  PMK Vol. 1 62:19-63:6.  In 2025, KTXL, as a Fox Sports affiliate, had the rights to broadcast the Super Bowl, which presented a high revenue sales advertising opportunity for the Station.  PMK Vol. 1, 56:25-58:8; 62:19-63:6.  This meant the Station needed to start building sales packages as early as April, May, and June 2024.  PMK Vol. 1, 56:25-58:8; 62:19-63:6.

On May 21, 2024, Gunther inquired through the company's human resources team about plaintiff's status.  Red-Horse Dep., 57:23-58:14, Red-Horse Dep., Exh. D, Tribune 000146-149.  Human Resources representative Margarita Red-Horse provided an update from Haass about plaintiff, indicating that plaintiff had a scan scheduled for May 30 to assess remaining cancer cells and was expected to begin another round of chemotherapy in June, lasting through August or September.  Red-Horse Dep., 57:23-58:14, Red-Horse Dep., Exh. D, Tribune000146-149.  Gunther consulted with human resources representatives Margarita Red-Horse and Jasmine Menechyan on how to proceed, and Menechyan engaged Courtney Williams, Chief Diversity Officer and Vice President of Human Resources, for guidance.  PMK Part 1, 35:19-36:14; 38:9-39:3.  PMK Part 1 33:14-34:4; 39:16-22; PMK Vol. 2, 57:16-58:4.  Williams consulted with Menechyan and Red-Horse on plaintiff's absence and reviewed UNUM's documentation of when plaintiffs leave began and when it was exhausted.  PMK Vol. 2, 44:16-46:6; 57:16-58:4.

Based on the information available, Williams took the lead in drafting an exhaustion letter and provided draft versions of the letter for review by the human resources and management teams, ensuring that the language accurately reflected plaintiff's length of absence.  PMK Vol. 2, 44:16-46:6; 57:16-58:4.  Menechyan then forwarded the exhaustion letter to Gunther.  PMK Vol. 2, 58:9-24.  Gunther decided that she would wait to send the exhaustion letter to plaintiff, as she wanted to see whether there was an update on his return status after his May 30th appointment. PMK Vol. 2, 62:7-63:11; 71:25-72:7; 74:6-75:2, PMK Vol. 2, Exh. 3, Tribune_ 000275-277.

In anticipation of the NFL season and the Super Bowl, Gunther had to anticipate the time it would take to train a new EA, make them familiar with the Station, and participate in the long sales cycle to avoid the risk of not hitting the Station's revenue goals. PMK Vol. 1, 63:19-64:10. It takes roughly 90 days for an EA to ramp up. Covey Dep. 33:11-13; Gunther Dep. 50:15-24. Plaintiff was one of the company's top sellers, and the company wanted him to return, but if he was not returning, the company had to timely fill his position for the upcoming "spending season" —NFL, Christmas, and the Super Bowl—when advertisers lock in their sales. PMK Vol. 1, 67:9-24. Gunther was the most knowledgeable individual about the hardship to the business. Rosenfeld Dep., 25:13-26:7. On June 12, 2024, Margarita Red-Horse had a conversation with Cathy Gunther in which Red-Horse asked if there was any way to continue to accommodate plaintiff. ECF No. 57 at 7-8. Gunther responded that the business could not sustain it, and when Red-Horse asked Gunther for the reasons, Gunther responded it was "just too hard" and that Gunther "needed to continue to try to get her departments in order." Red-Horse Depo., p.34:12-24. Gunther ultimately made the decision to terminate plaintiff's employment. Gunther Dep., 33:2-9. Tribune finalized its decision to terminate plaintiff's employment, effective July 1, 2024. Undisputed Material Facts ("UMF") 112.

## IV.    Discussion

Defendant moves for summary judgment on all remaining claims. ECF No. 41. The motion is fully briefed. Because plaintiff's first cause of action is a derivative claim, as discussed below, the court begins the analysis with plaintiff's second cause of action.

A.  Second Claim: Medical/Disability Discrimination in Violation of FEHA

California's Fair Employment and Housing Act ("FEHA") "prohibits an employer from, among other things, discharging a person from employment because of a medical condition or physical disability." Soria v. Univision Radio Los Angeles, Inc., 5 Cal. App. 5th 570, 583 (2016) (citing Cal. Gov't Code § 12940(a)), review denied (Mar. 1, 2017). "In order to prevail on a discriminatory discharge claim under section 12940(a), an employee bears the burden of showing (1) that he or she was discharged because of a disability, and (2) that he or she could perform the

essential functions of the job with or without accommodation," i.e. "that he or she is a qualified individual with a disability." Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal. App. 4th 952, 962 (2008). The parties do not dispute that plaintiff suffered from a medical condition or disability. However, the court has reviewed the parties' contentions and the facts presented and finds that multiple questions of material fact exist as to whether plaintiff was a "qualified individual," as well as the reason for plaintiff's discharge, precluding summary judgment.

A "qualified individual" is someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" Brundage v. Hahn, 57 Cal. App. 4th 228, 235 (1997) (quoting 42 U.S.C. § 12111(8)). A medical leave of absence may constitute a reasonable accommodation. "If [a plaintiff]'s medical leave was a reasonable accommodation, then [their] inability to work during the leave period would not automatically render [them] unqualified. Determining whether a proposed accommodation (medical leave in this case) is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999) (emphasis added); see also Villalobos v. TWC Admin. LLC, 720 Fed. Appx. 839, 841 (9th Cir. 2017) (citing Nunes in support of the proposition that, under FEHA, "the proper inquiry for an otherwise qualified individual who is terminated while on leave is whether the leave was a reasonable accommodation and did not impose an undue hardship on the employer").

California law distinguishes between the need for an "indefinite" leave of absence, which is likely to be unreasonable as a matter of law, and a "finite" leave, which is more likely to be reasonable. See Atkins v. City of L.A., 8 Cal. App. 5th 696, 721 (2017) ("FEHA may require as a reasonable accommodation a finite leave of absence to allow an employee time to recover from temporary injuries, but FEHA does not generally require an employer to provide an indefinite leave of absence to await possible future vacancies."); see also Cal. Code Regs. tit. 2, § 11068(c) ("When the employee cannot presently perform the essential functions of the job, or otherwise needs time away from the job for treatment and recovery, holding a job open for an employee on a leave of absence or extending a leave ... may be a reasonable accommodation provided that the

12

leave is likely to be effective in allowing the employee to return to work at the end of the leave, with or without further reasonable accommodation, and does not create an undue hardship for the employer.... An employer, however, is not required to provide an indefinite leave of absence as a reasonable accommodation.").

The question is whether plaintiff had requested and/or been granted a finite continued leave of absence from June 12, 2024 through September of 2024, and whether defendant could have accommodated that finite leave.  ECF No. 46 at 9.  It is plain that the parties take opposite positions, but plaintiff has put forth sufficient evidence indicating that reasonable minds could differ.  For example, plaintiff testified that he was released to return to work by his physician in mid-August of 2024.  ECF No. Romero Dep.  p.198:4-16 (ECF No. 49 at 82).  Plaintiff's direct supervisor, Mr. Haas, testified that defendant could have covered plaintiff's absence and continued to do so even if plaintiff's leave had been extended past June 12, 2024.  Haass Depo., p.52:22-24 (ECF No. 49 at 101-192).  Cathy Gunther sent an email indicating she understood that plaintiff would return to work in September, and when questioned about that email stated that at the time she understood plaintiff's "treatment won't be finished until August or September, so I assumed he would return after his treatment."  Gunther Depo., January 12th, 2026, p.65:20-22 (ECF No. 49 at 35).  This evidence and other evidence submitted by plaintiff demonstrates that there are genuine factual questions regarding defendant's understanding of plaintiff's need for a finite leave of absence, and defendant's ability to accommodate the necessary leave.

There is also a dispute as to the reason plaintiff was terminated: whether it was because of his need for an extended leave of absence, or because of unrelated business needs.  ECF No. 57 at 2.  Plaintiff's direct supervisor, Mr. Haas, who would have had direct knowledge of the department's business needs, was never consulted regarding whether his department had a business need to immediately fill plaintiff's position.  Deposition of Matthew Rosenfeld, p.27:1-6 (ECF No. 49 at 108-09);  Haass Depo., p.24:1-18 (id. at 96).  Further, though Cathy Gunther indicated that she needed a sales team of 15 people in plaintiff's department (ECF No. 49 at 7), Stephanie Covey, the Director of Sales, indicated that a team of 15 was something that had been stated as a nationwide standard at some point, but it was never a local goal, and plaintiff's unit

had never reached that number.  Covey Depo., p. 21:2-22:17 (ECF No. 49 at 149-50).  The evidence before the court does not provide a definitive answer as to the actual reason for plaintiff's termination.  The facts in dispute render summary judgment inappropriate.

B.  Third Claim: Failure to Accommodate Disability in Violation of FEHA

"The FEHA imposes on the employer the obligation to make reasonable accommodation." Scotch v. Art Inst. of California, 173 Cal. App. 4th 986, 1003 (2009).  The statute provides, in relevant part, that "[i]t is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: ... (m) For an employer ... to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  Cal. Gov't Code § 12940.  "To establish a reasonable accommodation claim, an employee must show that (1) the employee has a disability under FEHA, (2) the employee is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the employee's disability."  Aparicio v. Comcast, Inc., 274 F. Supp. 3d 1014, 1029 (N.D. Cal. 2017).  "A reasonable accommodation is 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.'"  Id. (quoting Nadaf-Rahrov, 166 Cal. App. 4th at 974).  However, the requirement to accommodate is not unlimited; "[a]n employer is not required to make an accommodation 'that is demonstrated by the employer ... to produce undue hardship to its operation.'"  Scotch, 173 Cal. App. 4th at 1003 (citation omitted).

The accommodation required in this case, an extension of medical leave, is the same accommodation at issue in plaintiff's discrimination claim.  The same legal standards apply to the shared elements of the two claims.  See, e.g., Nealy v. City of Santa Monica, 234 Cal. App. 4th 359, 378 (2015) ("The showing required" for the "qualified individual" prong of a disability discrimination case "is identical to that required for a cause of action for failure to reasonably accommodate.").  For all the reasons discussed above, disputed issues of material fact render summary judgment inappropriate as to this claim.

////

14

C.  Fourth Claim: Failure to Engage in the Interactive Process in Violation of FEHA

Under FEHA it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." § 12940(n). Section 12940(n) imposes separate duties on the employer to engage in the "'interactive process'" and to make "'reasonable accommodations.'" Wilson v. County of Orange, 169 Cal.App.4th 1185, 1193 (2009).  The interactive process "is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. Ritualized discussions are not necessarily required." Id. at 1195.

"The interactive process imposes burdens on both the employer and employee.  The employee must initiate the process unless the disability and resulting limitations are obvious." Scotch v. Art Inst. of California, 173 Cal. App. 4th 986, 1013 (2009).  "Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous." Id.  Both the employer and employee are obligated to keep communications open and are required to participate in good faith.  Id.  "Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." Gelfo v. Lockheed Martin Corp., 140 Cal.App.4th 34, 62 n. 22 (2006).  For an employer to be liable for failure to engage in the interactive process, the employee must be able to identify a reasonable accommodation that would have been available during the interactive process. Scotch, 173 Cal. App. 4th at 995.

It is undisputed that plaintiff's direct manager, Mr. Haass, told plaintiff that he had "received an extension of your leave from unum but it only went from 2/29 to 3/30" and asked plaintiff what his "recovery time" would be.  ECF No. 47 at 12.  It is undisputed that plaintiff responded that following his March 28, 2024 surgery, there would be a 6-8 week recovery period followed by 2 months of radiation. Id. at 12.  There is no evidence that defendants asked for a date certain or contacted plaintiff for clarification before terminating his employment.  Gunther

15

Depo. (ECF No. 49 at 37-40).  Whether defendant's efforts were adequate is a question for the jury.  Open questions of material fact render summary judgment in appropriate.

D.  First Claim: Wrongful Termination in Violation of Public Policy

Plaintiff's claim for wrongful termination in violation of public policy is a derivative claim that rests entirely on the FEHA claims discussed above.  Because summary judgment is not appropriate as to the FEHA claims, it is also not appropriate as to the wrongful termination claim.

V.    Motions to Exclude Expert Witnesses

A.  Overview

Each party has brought a motion challenging the opposing party's expert witness.  ECF Nos. 40, 42.  The parties each refer to Federal Rule of Evidence 702, which allows an expert witness with "scientific, technical, or other specialized knowledge" to testify in the form of an opinion if "(1) the testimony is based upon sufficient facts or data to support an opinion; (2) the expert's opinion is the product of reliable principles or methods; and (3) the proposed expert has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-92 (1993).[1]  As a preliminary matter, the court declines to consider the parties' Rule 702 and Daubert arguments at this time.  The parties may reassert these arguments at a hearing on motions in limine to be scheduled at the Final Pretrial Conference.[2]

B.  Standards Under Rule 26, Fed. R. Civ. P.

The legal rule applicable at this juncture is that of Federal Rule of Civil Procedure 26, which also sets boundaries upon expert disclosures and which the parties also reference.  The Rule requires that written expert reports must be based on sufficient facts or data to set forth a complete statement of all or any opinions.  Specifically, Fed. R. Civ. P. 26(a)(2)(B) states that an expert report *must* contain:

---

[1] Under these rules, courts act a "gatekeeper" and admits expert testimony only if it is both reliable and relevant.  Daubert, 509 U.S. at 589; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (holding that the court's gatekeeping obligation did not apply only to "scientific" testimony).

[2] Trial scheduling will be addressed by separate order.

16

(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of al publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). In short, "the [expert] report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir. 1998) (excluding the testimony of expert witnesses where counsel failed to submit timely expert witness reports, the reports were substantively deficient, and counsel offered no meritorious excuse for the deficiency or failure issues); see also Alorica, Inc. v. Boston Consulting Grp., Inc., 2022 U.S. Dist. LEXIS 100694, at *9 (C.D. Cal. Feb. 22, 2022). "Parties are 'entitled to a complete disclosure of all opinions – not a sneak preview of a moving target.'" Alorica, Inc., 2022 U.S. Dist. LEXIS 100694, at *9-10 (citing Mariscal v. Graco, Inc., 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014)).

   C.  Defendant's Motion to Exclude Plaintiff's Expert

       Defendant asks the court to exclude plaintiff's expert witness on damages, economist George Jouganatos, Ph.D. Plaintiff served defendant with the Expert Witness Report of Dr. Jougantos (ECF No. 40-3) on January 5, 2026. Declaration of Brandon P. Macken in Support of Defendant's Motion ("Macken Decl.") at ¶ 5, Ex. D. Dr. Jouganatos is a lecturer in economics, management, and management information science at California State University, Sacramento. Id. Dr. Jouganatos also provides consulting services, including for litigation purposes. Id. In forming his opinions, Dr. Jouganatos states that he relied on "information provided by the Ruggles Law Firm," which includes "[Plaintiff's] complaint, employment record at Tribune, pay advices 2020-2024, resume, and responses to economist's questionnaire and follow-up questions." Id. Dr. Jouganatos's report goes to damages, and his proposed damages model

////

17

consists of two components – historic loss ("back pay") and projected future loss ("front pay"). Id.

Defendant contends that "Dr. Jouganatos failed to specify what information he relied upon in forming his opinion within his written report as required under Rule 26 of the Federal Rules of Civil Procedure." ECF No. 40 at 2. Defendant argues Dr. Jouganatos failed to submit a "detailed and complete" written expert report as required by Federal Rule of Civil Procedure 26 as his report failed to contain the facts or data considered by Dr. Jouganatos in forming his opinions." Id.

Plaintiff submitted the expert disclosure of Dr. Jouganatos on January 5, 2026. ECF No. 40-3 at 35. Dr. Jouganatos submitted a declaration in which he described his background and qualifications. Id. at 37-38. In relevant part, he stated that his "assignment is to analyze the historic ('back pay') economic loss and the present value of future ('front pay') economic loss for Mr. Sergio Romero." Id. at 38. He stated the analysis was "based on information provided by the Ruggles Law Firm." Id. Dr. Jouganatos stated he concluded that "Mr. Romero suffered past lost earnings of $341,021 . . . will suffer future lost earnings and benefits with a present value of $634,213 . . . [and] that the total economic loss attributable to the termination is $975,234." Id. He stated that he "employed a standard forensic economic methodology consisting of: (1) establishing a baseline earnings stream, (2) projecting earnings over worklife expectancy, (3) accounting for benefits, (4) applying wage growth, and (5) discounting to present value using a risk-free rate." Id.

The substance of the report is four-and-a-half pages long. Id. at 41-45. It states that the analysis is "based, in part, on information provided by the Ruggles Law Firm. The following relevant documents were among those reviewed: Complaint, Mr. Romero's employment record at Tribune, pay advices 2020-2024, resume, and responses to economist's questionnaire and follow-up questions." Id. at 44-45. Dr. Jouganatos calculated back pay as extending from July 1, 2024 to June 1, 2026, and front pay from June 1, 2026 going forward 3.58 years, the remainder of plaintiff's projected "worklife." Id. at 45. No substantive explanation was provided regarding the choice of dates. Defendant deposed Dr. Jouganatos on January 23, 2026. ECF No. 40-3 at 122-

18

146.  At the deposition, Dr. Jouganatos clarified that in preparing for issuing his opinion he exchanged "several" emails with plaintiff's counsel, some of which included attachments such as a questionnaire sent by Dr. Jouganatos.  Id. at 126.  Dr. Jouganatos stated that he had follow up questions  regarding the questionnaire that were discussed via email with plaintiff's counsel.  Id.

Having reviewed Dr. Jouganatos's report, the court finds it sufficient for the purposes of Fed. R. Civ. P. 26(a)(2)(B)(ii).  The report does not reproduce the questionnaire or responses and follow-up questions upon which the expert expressly relied.  However, the scope of what Dr. Jouganantos testified to is limited and is adequately supported by documents in defendants' possession or that were obtainable by defendant.  Indeed, Dr. Jouganantos's report identifies all of the documents he reviewed and relied upon, and any failure to attach documents or exhibits does not prejudice the defendant because it already has plaintiff's pay information, and that was the bulk of the evidence the expert relied upon.  Though defendant argues that Dr. Jouganatos expressly states he relied upon unattached documents (the economist questionnaire, attorney communications), defendant could have subpoenaed those documents and obtained them at the expert's deposition, but they chose not to do so.  The court finds the report sufficiently complied with Rule 26(a)(2)(B).  Accordingly, the motion is DENIED.

D.  Plaintiff's Motion to Exclude Defendant's Expert

Plaintiff moves to exclude the statement of defendant's expert witness, vocational rehabilitation expert June Hagen, Ph.D., that plaintiff could have found work within 23 weeks of his termination.  Plaintiff asserts this testimony should not be permitted because (1) Dr. Hagen's expert witness report fails to identify any substantially comparable positions that were available in December 2024; (2) Dr. Hagen's reliance on Bureau of Labor Statistics to determine plaintiff could have found comparable employment within 23 weeks from his termination is not based on any facts or evidence of substantially comparable positions in the Sacramento area; and (3) none of the open positions identified in Dr. Hagen's expert witness report meet the standard for "substantially similar employment."  ECF No. 42-1 at 7.

Dr. Hagan's report was disclosed on January 14, 2026.  ECF No. 42-2 at 8.  Her report identifies the documents she reviewed, which include deposition transcripts, court filings, and

19

discovery responses.  Id. at 10-11.  The report includes a summary of plaintiff's personal, medical, educational, and work history, as well as his employment skills and history of compensation.  Id. at 11-14.  The report includes a timeline of Mr. Romero's job search, which Dr. Hagen states that she sourced from plaintiff's deposition.  Id. at 15.  Dr. Hagan conclude that had plaintiff "performed a reasonable job search, he would have been able to secure full-time substantially similar employment as an Account Executive in media sales by 12/9/24."  Id. at 16.  Dr. Hagan attached as exhibits (1) her literature review and resource books on performing diligent job searches, (2) a U.S. Bureau of Labor Statistics document entitled "Labor Force Statistics from the Current Population Survey," (3) her own labor market research results, and (4) a list of media/marketing/advertising agencies within 25 miles of Sacramento, California.  Id. at 18-56

Plaintiff contends that Dr. Hagen's failure to identify specific comparable positions undermines both the legal sufficiency of her report and the reliability of the expert testimony under Daubert.  ECF No. 42-1 at 7-18.  Plaintiff does not identify any procedural defect in the disclosure of Dr. Hagen under Rule 26.  Rather,  plaintiff challenges the substance of Dr. Hagen's opinions.  Because plaintiff does not identify any Rule 26 defects, the motion is DENIED.

## VI.    Conclusion

Accordingly, the court orders as follows:

1.  Plaintiff's ex parte application to authenticate exhibits (ECF No. 63) is GRANTED;

2.  Plaintiff's motion to exclude defendant's expert (ECF No. 42) is DENIED without prejudice to a motion in limine under Fed. R. Evid. 702 and Daubert, supra, to be scheduled at the Final Pre-Trial Conference;

3.  Defendant's motion to exclude plaintiff's expert (ECF No. 40) is DENIED without prejudice to a motion in limine under Fed. R. Evid. 702 and Daubert, supra, to be scheduled at the Final Pre-Trial Conference;

4.  Defendant's motion for summary judgment (ECF No. 41) is DENIED;

5.  The April 29, 2026 deadline for the Joint Pretrial Conference Statement is VACATED;

6.  The parties are ORDERED to participate in a settlement conference before a different Magistrate Judge, to be set by separate minute order;

7. The current pre-trial conference and trial dates are VACATED and re-set as follows:

    a. A Final Pre-Trial Conference will be held on September 9, 2026 at 10:00 a.m. before the undersigned in Courtroom 26. Pretrial statements shall be filed in accordance with Local Rules 281 and 282 and the requirements set forth in the previous Pretrial Scheduling Order (ECF No. 30 at 5-6);

    b. A Jury Trial will begin on October 19, 2026 at 9:00 a.m. before the undersigned in Courtroom 26.

IT IS SO ORDERED.

DATED: April 23, 2026

_____

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE